UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| THOMAS L. MORRIS and<br>KARIN MORRIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL NO.  2:10cv504 |
| | ) | |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant,

Ford Motor Company ("Ford"), on June 26, 2012.  The plaintiffs, Thomas L. Morris and Karin

Morris (collectively "Morris"), filed their response on August 10, 2012, to which Ford replied on

August 24, 2012.  On this same date, Ford filed a Supplemental Designation of Evidence.

However, on September 5, 2012, Morris filed a motion to strike Ford's Supplemental

Designation of Evidence, to which Ford responded on September 12, 2012.

Also before the court is a motion to strike evidentiary submissions filed by Ford on

August 24, 2012.  Morris filed his response on September 4, 2012, to which Ford replied on

September 11, 2012.  Morris filed a surreply on September 14, 2012. However, on September

14, 2012, Ford filed a motion to strike Morris' surreply.  Morris responded to the motion to

strike surreply on October 30, 2012, to which Ford objected (on grounds of untimeliness) on

November 2, 2012. Morris then replied to Ford's objection on November 5, 2012.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine

issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

## Discussion

The following facts are recited by Ford in support of its motion for summary judgment, and do not appear to be disputed. Morris, a truck driver, alleges that on September 21, 2010, he was injured in the State of Ohio when a load of skids fell on him after he opened the trailer doors on the trailer he was transporting. At the time of the accident Morris held a Commercial Driver's License. Morris was employed by Williams, which contracted with Ford Motor Company to transport slip racks[1] between AAP St. Marys Corp (located in St. Marys Ohio) and Ford's Chicago Assembly. Williams was a for-hire motor carrier that operated in interstate commerce under USDOT identification number 344454 and operating authority number MC-216904 issued by the Federal Motor Carrier Safety Act ("FMCSA") or predecessor agencies at the time of the incident on September 21, 2010.

---

[1] The slip racks are also referred to as skids, pallets or, more commonly, as dunnage.

After the rims are removed from the slip racks, the empty slip racks are loaded by forklift onto the trailer by Ford employees. As part of his route, after having made a delivery of a trailer containing slip racks with rims, Morris would connect to a trailer loaded with the empty slip racks (dunnage). Before Morris would pick up the trailer with the dunnage, he would inspect the trailer and the dunnage. Before the doors were closed on the trailer, Morris had the opportunity to observe the condition of the load. Drivers of Williams are instructed that if there is a load that is not safe, they are not to take the load, and are to call the Williams dispatcher. Morris was specifically informed of this policy. According to Wayne Miller[2], it was the responsibility of the driver of the tractor to secure the load.

Before addressing the merits of Ford's motion for summary judgment, the court will first consider Ford's motion to strike Morris' evidentiary submissions.[3] In ruling on a motion for summary judgment, the court should only consider properly designated evidence that would be admissible at trial. Fed. R. Civ. P. 56(e); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 n. 2 (7th Cir. 1994); Colan v. Cutler-Hammer, Inc., 812 F.2d 357, 365 (7th Cir. 1987) (confirming that a district court in a federal summary judgment proceeding may "only consider evidence and statements that would be admissible at trial and that have probative force.").

The Seventh Circuit is clear on the following point: summary judgment may not be defeated by evidence that is not admissible at trial. *Medina v. City of East Chicago, Indiana*, 184

---

[2] Wayne Miller was, at that time, the safety director at Williams.

[3] There are two other motions to strike which do not deal specifically with evidence. Morris filed a motion to strike Ford's supplemental reply to its summary judgment motion, and Ford filed a motion to strike Morris' supplemental reply to Ford's motion to strike evidence. Both of these motions are denied, and the court will consider all the briefs that have been submitted.

F.Supp.2d 805, 814 (N.D. Ind. 2001). Rule 56(e) demands something more than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the truth of the matter asserted. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992). Thus, designated materials that include legal conclusions, hearsay, irrelevant or immaterial matter, and opinions without an underlying factual basis should be excluded from consideration. *Bradley v. Work*, 154 F.3d 704, 707 (7th Cir. 1998) (holding district court was correct in deciding to strike inadmissible hearsay, lay opinions, speculation and conclusions); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998) (noting that testimony containing inferences and opinions without factual basis, bald assertions and conclusory assertions should be disregarded).

Ford first argues that Morris' Exhibit F, which consists of emails, should be stricken because they have not been authenticated, are irrelevant, and constitute inadmissible hearsay. Before evidence may be admitted, it must be authenticated. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). In *Rogers v. Ford Motor Co.*, 952 F. Supp. 606, 610-11 (N.D. Ind. 1997), this court noted that "[i]t is well established that materials submitted for summary judgment must be otherwise admissible." In response to Ford's motion for summary judgment in this case, Morris designated "Exhibit F", which is titled "Emails regarding incident". Ford contends that the designated emails have not been properly authenticated or "otherwise verified". Ford further contends that the emails are not relevant to any of the issues presently before the court.

Exhibit F consists of four emails which appear to be from St. Mary's Corp. to Ford, and

reference photos of the accident scene, and requests that in the future dunnage be secured with straps to avoid further accidents, as is usually done with their other customers. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Ford argues that the emails designated by Morris say nothing about what Ford knew or should have known regarding the safety of its cargo loading practices. Clearly, the emails at issue were sent after the subject accident and, as such, they have no bearing on what Ford "knew or should have known" before the accident. Morris, however, claims that the emails are relevant in that they show industry practice by another motor company shipper of securing the cargo, safety concerns, and feasibility at the time of the accident. The relevant issue, however, is whether Ford knew or should have known that its cargo loading practices were unsafe. All the emails show is that another motor carrier is known by Dan Danaher of St. Marys Corp. to secure their loads with straps. The emails do not show or tend to show that it was more or less probable that Ford knew its practices were unsafe. Therefore, Exhibit F will be stricken.

Ford next argues that Exhibit N, which is titled "The Employer's First Report of Injury Form" should be stricken because it is inadmissible hearsay[4] (and double hearsay). Morris is using the report to prove that the cause of the injury was "IMPROPER LOADING BY FORD", as stated in the report.[5] Ford also points out that the injury report is not a Ford document, but a document of a non-party that was prepared for purposes of workers' compensation. Morris

---

[4] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Fed.R.Evid. 801(a).

[5] The same report lists "FAILURE TO FOLLOW DOOR OPENING PROCEDURES" as an unsafe act by the driver (Morris) that caused the injury.

counters that the injury report falls within the business records exception to the hearsay rule, Rule 803(6). Morris contends that the report was kept in the regular course of business at Williams, Morris' employer, and that report was completed whenever an employee was injured at Williams. Williams employee, Wayne Miller, authenticated his own words and signature on the report in his deposition.

Ford points out that the injury report makes clear that it is a workers' compensation document and the Seventh Circuit has repeatedly held that "reports prepared with an eye toward litigation, even though made in the course of the business' operations, are not admissible under Rule 803(6)." *Thakore v. Universal Mach. Co. of Pottstown, Inc.*, 670 F. Supp.2d 705, 725 (N.D.Ill. 2009). However, there is no evidence that the report was prepared with an eye toward litigation, and on its face shows that it was prepared in support of a workers' compensation claim, which is not necessarily "litigation". Moreover, the author of the report, who investigated the accident, testified that he wrote the report in his own words and signed it. Thus, this court finds that the report is admissible as it is not hearsay, and even if it was hearsay, it appears to meet the business record exception to the hearsay rule. Exhibit N will not be stricken.

Next, Ford requests that Exhibit O, an affidavit and expert report by Sterling Anthony, be stricken. Ford argues that Anthony is not qualified to offer expert testimony, that the opinions he has offered are not based upon reliable methodology and that his opinions invade the province of the court. The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir.2007). Under Rule 702, "[t]he district court is a 'gate-keeper' who determines

whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru–Con Inc.*, 498 F.3d 734, 741– 52 (7th Cir.2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir.2006)). The court's task "is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharm., Inc. (Daubert II)*, 43 F.3d 1311, 1316 (9th Cir. 1995). Courts are warned against the blind acceptance of a scientific expert's assurance that his conclusions are supported by reliable science. "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method be deemed conclusive.'" *Daubert II*, 43 F.3d at 1315-1316. Courts use a three-step analysis to determine the admissibility of expert testimony: (1) whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education," (2) whether the subject of an expert's testimony is "scientifically reliable," and (3) whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin*, 492 F.3d at 904; *see also Myers v. Illinois Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir.2010).

A witness is only qualified as an expert if the "area in which the witness has superior knowledge, skill, experience, or education," matches the "subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). In examining whether the expert is qualified in the relevant field, the court should consider a proposed expert's "full range of practical experience as well as academic or technical training." *Smith v. Ford Motor Co.*, 215 F.3d 713, 717 (7th Cir. 2000). The proponent of expert testimony has the burden of proving their compliance with Fed. R. Evid. 702. *Daubert*, 509 U.S. at 592.

The issue in the case at bar is whether Ford was responsible for the securement of a load

inside a commercial motor vehicle. Ford argues that Anthony simply is not qualified to offer opinions with respect to commercial motor vehicles, the Federal Motor Carrier Safety Regulations or the industry practices with respect to commercial motor vehicles.

According to Anthony's curriculum vitae (CV), he received his degree in "packaging engineering". Ford contends that this case clearly does not involve any issues related to the manner in which an item was packaged, but rather, with how a load of cargo was secured in a commercial motor vehicle. Ford also argues that Anthony's "industry experience" is in the areas of packaging, marketing and logistics and experience in these areas is not relevant to the issues in this case.

Morris insists that Anthony's CV shows that he is fully qualified. This CV shows that Anthony received a B.S. in Packaging Engineering, and an M.B.A. in Marketing and Finance, and also took doctoral courses in International Marketing and Logistics. Morris has not explained how any of this education renders Anthony an expert in loading and securing cargo in a commercial motor vehicle. Anthony's CV states that his "Expert Witness Experience" includes actions involving "product liability/personal injury, failure to warn, regulatory violations, and intellectual property infringement." Again, Morris fails to explain how this experience shows that Anthony is qualified to testify regarding the issues in this case.

In any event, Ford has also argued that there is no way to ascertain the reliability of Anthony's opinions. Ford notes that, by Anthony's own admission, his opinions are based upon nothing more than his review of the discovery in this case and his claimed experience "in packaging, marketing and logistics". Anthony failed to rely upon any independent authority to support his opinions.

The Advisory Committee's note to Fed. R. Evid. 702 provides that "in certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Nevertheless, the note also provides that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'")

In the present case, the court agrees with Ford that Anthony fails to provide an explanation for his opinions in conformance with the framework provided by the Advisory Committee's note. Anthony fails to cite to a single authority or describe how he formulated his opinions through his experience. For example, Anthony stated that, "For Ford to have loaded dunnage within a truck without adequately securing the load against in-transit movement was a violation of industry standards; consequently, the load was rendered unreasonable dangerous". The only analysis provided in advance of the conclusory statement is to explain what dunnage is and to state that it can move within a truck if not secured. This is not enough. *See Reed v. City of Chicago*, 2006 WL 1543928, 2-3 (N.D. Ill.2006) (excluding expert's opinion that was based upon his knowledge and the "usual and customary" practices in the industry because he "does not cite to any authority or describe how he formulated his opinions"). By simply invoking his claimed experience without explaining how his expertise led him to reach his opinions, Anthony fails to provide the Court with any means to assess the reliability of his opinions. *See Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, 2007 WL 1850858, 7 (N.D. Ind. 2007), citing *Zenith Elecs. Corp. v. WH-T Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) (noting that an

expert "who invokes 'my experience'…is not an expert as Rule 702 defined that term…").  Thus

this court finds that Anthony's opinions and conclusions are not based upon a reliable

methodology.

Moreover, Anthony's opinions do not assist the trier of fact and are, rather, impermissible

legal opinions and conclusions.  Anthony has offered the following opinions in his affidavit and

expert report:

> A. The injuries suffered by Thomas Morris, when cargo fell
> on him when he opened the rear door of his truck, were
> the direct and proximate results of the loading practices
> at Ford Motor Company Chicago Assembly Plant ("Ford").

> B. Ford's loading practices did not utilize adequate load
> securement methods; therefore, the load was free to shift
> during transit, an ability that makes the load
> unreasonably dangerous.

> C. By failing to adequately secure the load, Ford violated
> industry standards that require loads to be rendered
> immobile within a vehicle.

> D. Ford exclusively undertook to load the cargo, and thus,
> was obligated to use care and skill, as is reasonable as is
> called for in this industry.

> E. Ford failed to use care and skill in securing the load and
> in fact took no steps to secure the load.

> F. Had Ford secured the load and rendered it immobile, per
> industry standards, Thomas Morris would not have been
> injured.

> G. Ford knew of the foreseeable consequences of
> inadequately secured loads, including the possibility of
> injuries stemming from falling cargo, evidenced by a Ford
> Safety Single Point Lesson, Topic: Trailer Door Opening.

> H. Ford knew that common-sense, self-suggesting means of
> preventing falling cargo is to adequately secure it within the

> truck, such that the cargo remains immobile throughout
> transit.
>
> I. I have no criticism of Thomas Morris's behavior in
> opening the rear door of the truck; in that I have no basis
> for opining that he was reckless.

Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003). "[T]he question of whether a duty to exercise care arises is governed by the relationship of the parties and is an issue of law within the province of the court." *Merrill v. Knauf Fiber Glass Gmbh*, 771 N.E.2d 1258 (Ind. Ct. App. 2002). Accordingly, Indiana courts have held that an expert witness was not permitted to testify that the defendant was responsible for a defective condition and owed the plaintiffs a duty. *Merrill*, 771 N.E.2d at 1263, citing *Harman v. C.E. & M, Inc*., 493 N.E.2d 1319, 1321 (Ind.Ct.App.1986), reh'g denied, trans. denied.

Ford has directed the Court's attention to *Pawlik v. Indus. Engr. & Equip. Co., Inc*., 2009 WL 857476 (N.D. Ind. 2009), supplemented 2009 WL 5341658 (N.D. Ind. Apr. 15, 2009), where the Court addressed very similar opinions offered by Anthony. In *Pawlik*, the Court struck many of Anthony's opinions, reasoning as follows:

> In statements 1–3, 5–15, 17–24, and 31–32, Anthony asserts
> improper legal definitions or asserts legal conclusions. Whether a
> duty exists is a matter of law, not a matter for a packaging expert.
> Statements 1, 10, 12 and 14 assert that the crate was defective
> and "unreasonably dangerous," and that Industrial breached its
> duty. Statements 2, 5, 6, 8, 9, and 20 label Pawlik's use of force "a
> reasonably foreseeable act" or "foreseeable." Statement 3 calls any
> assumption that pallets/crates such as the one here would be
> handled only mechanically "unreasonable." Statement 7 concludes
> that Pawlik's actions "were neither reckless nor assumptive of a
> known (or even believed) risk." Statement 11 asserts a causation
> argument that but for the defects of the crate, the accident would
> not have occurred. Statement 13 makes the legal conclusion that

Industrial is a seller of crates that puts them "into the commercial stream." Statement 15—clearly without knowledge of the IPLA's legal definitions of "sellers" and "manufacturers"—labels Industrial a crate manufacturer. Statements 17–19 conclude that Industrial breached a reasonable standard of care or express or implied warranties. Statements 21–23 assert that the "open and obvious" defense "is not applicable to the incident crate." Statement 24 asserts that Industrial "knew, or should have known" that its crates would be moved manually. Finally, Statement 32 concludes that Pawlik "was not reckless nor unreasonable in manhandling the crate." All of these statements cross the line from an expert opinion to either legal definitions, legal conclusions, or ultimate questions of fact better left for the jury. As the Seventh Circuit forewarned in Zenith, Anthony is just giving the "bottom line," which is not helpful to the process here, and all these statements are excluded.

*Id*. at 10.

In the case at bar, Anthony's opinions likewise cross the line from an expert opinion to either legal definitions, legal conclusions, or ultimate questions of fact better left for the jury. Opinions 'A' and 'F' assert causation arguments that Morris's injuries were the "proximate result" of Ford's loading practices or that, but for Ford's failure to render the load immobile, Morris would not have been injured. Opinions 'B', 'C' and 'E' assert that the load was "unreasonably dangerous" and that Ford breached its duty. Opinion 'D' asserts that Ford had a duty, which is again a matter of law for the Court to decide, not a matter for a packaging expert. Opinion 'G' asserts that Ford knew of "foreseeable" consequences of inadequately secured loads. Opinion 'I' asserts that Morris's behavior was not "reckless". Opinion 'H' addresses what Ford knew about "common-sense" and "self-suggesting" means of preventing falling cargo. Clearly, matters that are "common-sense" and "self-suggesting" are not proper matters for expert testimony because they could easily be understood by the average juror. "Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue

influence on the jury that would be subject to control under [Federal Rule of Evidence] 403."

*U.S. v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996).

In the case at bar, as in *Pawlik*, Anthony is providing legal conclusions and invading the province of the Court. For this additional reason Anthony's affidavit, expert report and all references to either, will be stricken.

Next, Ford seeks to strike evidence relating to Morris' damages. Ford argues that such evidence is irrelevant to the issues before the court, as the basis for Ford's motion for summary judgment is that it did not owe a duty to ensure that the load was properly secured. Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Although Morris contends that it was necessary to detail his injuries because injury is one of the elements of the tort of negligence, this court agrees with Ford that the extent of the injuries sustained by Morris is not a fact of consequence in determining the motion for summary judgment. In fact, it appears to be undisputed (at least for purposes of the pending motion) that Morris suffered an injury. Accordingly, Morris' damage/injury evidence will be stricken.

Lastly, Ford requests that Exhibit P, titled "Ford Safety Single Point Lesson" be stricken. Ford argues that the document has not been authenticated by affidavit or otherwise verified. Morris claims that the document is self-authenticating pursuant to Fed. R. Evid. 902(7) because the safety lesson contains Ford's logo at the top left hand corner of the document. However, Rule 902(7) simply provides that the inscription, sign, tag or label, itself, is authenticating, but not the entirety of every item, book, etc., to which it is attached. *See Whitted v. General Motors Corp.*, 58 F.3d 1200 (7th Cir. 1995).

Morris has also attempted to authenticate the document by designating external evidence in the form of a letter from Ford's former counsel and additional deposition testimony of Steven Knaak. Ford objects, and argues that it is improper and untimely for Morris to now attempt to designate additional evidence in response to a motion to strike. Local Rule 56.1 requires a party responding to summary judgment to designate, within 28 days, any materials that the party contends raise a genuine dispute. After an extension of time, Morris filed his designated materials on August 10, 2012, which did not include the additional testimony and documents he now cites to in order to authenticate his evidence. Then, on September 14, 2012, Morris filed a surreply to Ford's motion to strike, which included the additional evidence (to which Ford now objects). The court, in its discretion, accepts Morris' untimely evidence, and will not strike Exhibit P.

The court will now turn to the motion for summary judgment. Ford argues that it did not owe a duty to Morris to ensure the safety of the load transported by Morris. Ford contends that Federal regulations impose a non delegable duty upon a carrier to secure all loads safely. The FMCSA and regulations promulgated under the Act provide in pertinent part as follows:

Section 392.9 Inspection of cargo, cargo securement devices and systems:

(**a**) **General**. A driver may not operate a commercial motor vehicle and a motor carrier may not require or permit a driver to operate a commercial motor vehicle unless—

(1) The commercial motor vehicle's cargo is properly distributed and adequately secured as specified in §§393.100 through 393.136 of this subchapter.

(2) The commercial motor vehicle's tailgate, tailboard, doors, tarpaulins, spare tire and other equipment used in its operation, and the means of fastening the commercial motor vehicle's cargo, are secured; . . .

(**b**) **Drivers of trucks and truck tractors**. Except as provided in paragraph (b)(4) of this

section, the driver of a truck or truck tractor must —

> (1) Assure himself/herself that the provisions of paragraph (a) of this section have been complied with before he/she drives that commercial motor vehicle;

> (2) Inspect the cargo and the devices used to secure the cargo within the first 50 miles after beginning a trip and cause any adjustments to be made to the cargo or load securement devices as necessary, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from the commercial motor vehicle; and

> (3) Reexamine the commercial motor vehicle's cargo and its load securement devices during the course of transportation and make any necessary adjustment to the cargo or load securement devices, including adding more securement devices, to ensure that cargo cannot shift on or within, or fall from, the commercial motor vehicle. Reexamination and any necessary adjustments must be made whenever—

>> (I) The driver makes a change of his/her duty status; or

>> (ii) The commercial motor vehicle has been driven for 3 hours; or

>> (iii) The commercial motor vehicle has been driven for 150 miles, whichever occurs first.

In order to clarify Section 392.9 of the FMCSR, an interpretation was issued by the Federal Motor Carrier Safety Administration which states "It is the responsibility of the motor carrier and the driver to ensure that any cargo aboard a vehicle is properly loaded and secured." This interpretation was issued in response to the question: "Does the Federal Highway Safety Administration have authority to enforce the safe loading requirements against a shipper that is not the motor carrier?" Ford was the shipper of the racks and was not acting as a motor carrier. A carrier or its driver must ensure that his "vehicle's cargo is properly distributed and adequately secured." 49 C.F.R. § 392.9(a)(1). Moreover, a shipper cannot force a carrier to haul an unsafe load. *Decker v. New England Public Warehouse, Inc.*, 749 A.2d 762, 766 (Me. 2000); 49 C.F.R. § 392.9(a). Therefore, a carrier is required to take steps to prevent or protect cargo from shifting or falling. *See id.* §§ 393.100–393.136. As the Court in *Decker* observed, the nature of the

trucking industry suggests that carriers "should have the final responsibility for the loads they haul" because no shipper can force a carrier to accept an unsafe load. *Id.*

Under Indiana law, carriers generally have a duty to load and unload freight that they are responsible for transporting. *See Standard Oil v. Soberly*, 42 N.E.2d 373 (Ind. Ct. App. 1942). Although no Indiana appellate court has had an opportunity to rule on a case with facts substantially similar to the present case, courts from other jurisdictions have held that the general rule that carriers are responsible for the safe loading of their trucks extends to preclude personal injury claims filed by drivers against the one who loaded the driver's truck or trailer. *See Decker v. New England Public Warehouse, Inc.*, 749 A.2d 762 (Me. 2000).

In *Decker,* the plaintiff driver was injured when a load of pulp bales loaded on his semitrailer shifted and allegedly caused an accident. *Id*. The Plaintiff brought suit against the shipping company that loaded the semi-trailer, and the shipping company moved for summary judgment. *Id*. The trial court granted summary judgment for the shipping company on the basis that it did not owe the plaintiff a duty, and the plaintiff appealed. *Id*. On appeal, the Maine Supreme Court affirmed the trial court's entry of summary judgment and held as follows:

> When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent,
>
> the carrier will be liable notwithstanding the negligence of the shipper. The policy behind the *Savage* rule (shown above) is well founded. The everyday practice and understanding in the trucking industry, as aptly reflected in the federal regulations on the subject, reflect that carriers logically should have the final responsibility for the loads they haul. No shipper...can force a driver to accept a load that the driver believes is unsafe. By the same token, a driver must take responsibility for the safety of his or her cargo by inspecting and securing the load... The *Savage* rule simply extends the industry's reasonable understanding to negligence suits involving carriers and shippers...Most courts now accept the rationale of *Savage* and require carriers to take responsibility for the loads they carry, even if those loads have been improperly loaded by others. Here, the carrier has the

opportunity to intercept any problem through inspection. In fact, the carrier's driver is under the obligation to conduct such a safety inspection pursuant to federal law. Carriers, through their drivers, must ensure the safety of their own loads, even when cargo is loaded by shippers. The *Savage* rule that imposes liability on carriers for the loading done by shippers, even when negligent, has been accepted by the majority of modern courts and by federal regulators. After considering both industry practice and traditional duty of care jurisprudence, we accept its reasoning as well. [The shipping company] may only be liable if [the plaintiff's] tractor trailer was loaded negligently and that negligence was undiscoverable through a reasonable safety inspection.

*Id.* at 765-67 (citations omitted)(emphasis added).

Under Indiana law, a latent defect is a defect which is not discoverable through reasonable inspection. *Deckard v. Ratcliff*, 553 N.E.2d 523, 524 (Ind. Ct. App. 1990).The undisputed evidence in this case is that Morris had the opportunity to observe and inspect his load prior to transport, and again at the security gate at Ford. If the load were not properly loaded as he alleges, or was unsafe, he was not only *not* compelled to transport the load if he deemed the load unsafe, but could contact the dispatcher at his employer, Williams, to have the load adjusted. Morris could have observed any issues with the load, such as if it had not been loaded in the nose of the trailer, to clearly observe any such condition, which would then by definition be observable and not a latent defect.

Morris does not deny that he had multiple opportunities to inspect the load. Rather, he argues that Ford assumed the duty of properly securing the load by virtue of its "no touch" loading policy. The "no touch" loading policy provided that Ford employees would load the trailer, so that Williams' drivers would not have to touch the load. Ford also did not permit anyone other than a Ford employee to use the forklifts which were necessary to move the load.

This court agrees with Ford that a "no touch" policy does not trump the FMCSA's regulation requiring drivers to inspect cargo and adequately secure the cargo. If, as Morris

alleges, the cargo was improperly loaded such that the dunnage did not interlock properly, then it was Morris' duty to point that out and insist that the cargo be loaded properly. Likewise, if Morris believed that straps were needed to properly secure the load it was his duty to note that and request that the straps be secured.

In a case substantially similar to this one, *Hardesty v. American Seating Co.*, 194 F.Supp.2d 447 (Dist. Md. 2002), the federal district court in Maryland dealt with a case wherein a commercial truck driver pursued a negligence claim against a shipper for injuries he suffered after he was injured when cargo loaded by the shipper fell on him after arriving at his destination and opening the trailer doors. In *Hardesty*, not only did the shipper exclusively load the cargo onto the subject trailer (the argument made by Morris here), but its employees also took the additional steps of installing metal bracing to retard movement of the cargo while in transit. *Id*. at 449. The driver checked the load after it was loaded, but ignored it while it was being loaded. *Id*. The driver argued that the shipper had improperly loaded the cargo and caused his injury.

The *Hardesty* court rejected the driver's negligence argument. The court ruled that federal law required the driver "to exercise reasonable care for his own safety, in conformity with commonsense federal regulations requiring that before starting on his journey he 'assure himself …that the … commercial motor vehicle's cargo is properly distributed and adequately secured.'" *Id.* at 451.

Like the driver in *Hardesty*, Morris had multiple opportunities to inspect the cargo that was loaded by Ford and assure himself that it was properly distributed and adequately secured as he was required to do by the FMCSA. However, despite all of these opportunities to observe and inspect the cargo, and despite the requirements imposed by the FMCSA, Morris accepted the

cargo from Ford without any devices used to secure the cargo and delivered it to its destination. The responsibility for securing the cargo in this circumstance is squarely upon the commercial motor vehicle's driver, as required by the FMCSA. The *Hardesty* court ruled that this duty was inescapably the driver's, and the driver could not even rely on the shipper's installation of bracing to protect the load from movement in transit under the FMCSA. In this case, Morris' constrained argument that Williams' "no touch" policy, or the fact that only Ford forklift operators load trailers at Ford's facility, somehow negates Morris' duty to assure himself that the cargo was properly distributed and adequately secured, is without merit.

Morris has attempted to shift the duty to Ford by arguing that the cargo was negligently loaded or loaded in such a way that it created a latent defect. The cargo in this case consisted of plastic trays that have been referred to as "dunnage". These plastic trays are designed so that they interlock when stacked on top of each other. These plastic trays are interlocked and nested on top of each other before the forklift operator picks up a stack of them and loads them on the trailer. The stacks of interlocking trays are loaded in the front of the trailer first, and then the forklift operators work their way toward the back of the trailer.

Morris argues that the photographs of the accident scene, taken after several of the plastic trays fell out of the trailer and onto the ground, are evidence of improper loading by Ford or somehow establish a latent defect. Morris argues that negligence can be inferred based on the appearance of the plastic trays after they had fallen out of the trailer. Morris' counsel asked witnesses during depositions if the photographs of the fallen plastic trays indicated how they were positioned in the truck before they fell out, but omitted that testimony in his response brief. Notably, Morris' counsel had the following exchange with Daniel Danaher, an employee of the

consignee who was at the scene soon after the accident happened and whom Morris relied upon to authenticate the photographs for use in the summary judgment context:

> Q: Can you tell by looking at the photograph or from your recollection whether the dunnage inside the truck was stacked up, upside down, or right side up?

> A: I cannot tell. I have no way of telling that.

(Danaher dep., p. 23, lns 12-17.)

Ford notes that Morris has not identified one witness that has testified that the post-accident photographs are indicative of: (1) the manner in which the trailer was originally loaded; (2) the positioning of the plastic trays just before the right trailer door was opened by Morris at the consignee in St. Marys, Ohio; or (3) latent defects caused by the manner in which the trailer was loaded.

Ford correctly points out that common law prevents the court from inferring that the post-accident photos are indicative of how the cargo was stacked inside the truck prior to the accident. In *Anderson v. Griffin*, 397 F.3d 515 (7th Cir. 2005), the Court ruled that it was a fundamental proposition of tort law that just because "an accident occurs and someone is injured does not establish liability under a negligence standard; the plaintiff has to show that the injury resulted from the defendant's failure to exercise due care". *Id*. at 519. A jury may not infer negligence from the fact that an accident occurred. *Id*. (citing *Perry v. Goss*, 255 N.E.2d 922, 926 (Ind. 1970); *Kostidis v. General Cinema Corp*., 754 N.E.2d 563, 571-74 (Ind. Ct. App. 2001)). Negligence on the part of the defendant "can neither be supported by mere speculation or conjecture, nor can they be inferred by the mere fact that an accident occurred which resulted in an injury to a person". *Carter v. John Hennes Trucking Co.*, 210 F.2d 443, 445 (7th Cir. 1954).

Morris also argues that Ford's defective loading was somehow latent and prevented Morris from having the opportunity to observe the defects. (Opposition Brief, p. 21) Morris relies on the rule in *U.S. v. Savage Truck Line*, 209 F.2d 442, 445 (4th Cir. 1953) to argue that liability falls upon the shipper when it assumes the responsibility of loading cargo. However, the same case stands for the proposition that if any improper loading is apparent, then liability rests with the carrier notwithstanding any negligence of the shipper. *Id.* "Responsibility for obviously improper loading generally rests on the carrier, even though the shipper loaded the truck." *Franklin Stainless Corp. v. Marlo Transport Corp.*, 748 F.2d 865-868 (4th Cir. 1984).

Morris suggests that there may have been some plastic trays upside down or not properly nested which he would not have been able to see. (Opposition Brief, p. 21) Ford counters that this is a speculative assertion because Morris has submitted no evidence of any latent defect caused by the manner in which the plastic trays were loaded. The photographs make plain that the last row of plastic trays on the right side of the trailer fell out of the trailer when the right trailer door was opened. Ford claims that if the plastic trays that fell on Morris were loaded upside down, or were not nested properly, such problems would have been clearly visible to Morris prior to driving off with the load.[6] Also, the absence of devices used to secure the cargo from rearward movement (something Morris is required to assure himself of before driving the tractor-trailer), whether or not the cargo is upside down or interlocked, cannot be said to be latent.

Further, Morris admits he had the opportunity to inspect the cargo and he transported it

---

[6] Curiously, neither party has submitted evidence, such as a photo, showing what the stack of dunnage looks like in a trailer when improperly stacked.

anyway. Following the accident, Miller, the Safety Director at Williams, investigated the circumstances.[7] As a part of that investigation, Miller had a conversation with Morris and Morris indicated to Miller that he was present when the trailer was loaded and that he preferred that the cargo be pushed more toward the front of the trailer. (Miller dep., p. 35, lns 20-24; p. 36, lns 1-6.) Miller asked Morris about the photographs that indicated that the cargo was toward the back end of the trailer. (Miller dep., p. 36, lns 16-21.) Miller testified that Morris indicated Ford refused to push the cargo forward, but that Morris did not take any affirmative steps to address the problem. (Miller dep., p. 36, lns 23-24, p. 37, lns 1-16.) Therefore, despite the fact that the cargo was not distributed in the trailer in the manner preferred by Morris, he decided to operate the tractor-trailer anyway.

This court finds that there is no admissible evidence of improper loading by Ford. There is also no admissible evidence of any latent defect caused by the manner in which the cargo was loaded. In any event, if there was any defect in the manner in which the trailer was loaded, it was not a latent defect but, rather, one of which Morris had full knowledge and yet Morris transported the load anyway. Under the *Savage* rule, Morris' decision to go ahead and transport the cargo, despite knowledge of improper loading by Ford, imposes liability on the motor carrier and Morris. *U.S. v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1953).  Accordingly, as Ford has shown that it did not have a duty to Morris to ensure the safety of the load, Ford's

---

[7] As noted earlier with respect to the motion to strike evidence, Miller stated on a worker's compensation form that one cause of the accident was improper loading by Ford, and that another cause of the accident was driver error as Morris did not open the doors properly.  As there is no evidence to support either statement (as Miller seemed to have assumed that if the load fell it was partly Ford's fault), the statements are not entitled to much, if any, weight.  Even if the statements were given weight, they counter each other and Morris is left with a wash.

motion for summary judgment will be granted.

Ford has also requested summary judgment on Morris' claim that Ford was negligent in hiring its employees and on Morris' request for attorney fees. In his response brief, Morris has agreed to withdraw these two claims.

Conclusion

On the basis of the foregoing, Ford's motion for summary judgment [DE 35] is hereby GRANTED.  Further, Ford's motion to strike [DE 53] is hereby GRANTED IN PART AND DENIED IN PART.

Morris' motion to strike [DE 57] and Ford's motion to strike [DE 61] are both hereby DENIED.


 Entered: November 28, 2012.


s/ William C.  Lee
William C. Lee, Judge
United States District Court